Lee R. GOLDSTEIN, Petitioner,

v.

DEPARTMENT OF the TREASURY,
Respondent.

No. 94–3462.

United States Court of Appeals,
Federal Circuit.

March 31, 1995.

Ross D. Cooper, Washington, DC, for petitioner.

Before MAYER, MICHEL, and BRYSON, Circuit Judges.

## DECISION

MICHEL, Circuit Judge.

Lee Goldstein petitions for review of the June 1, 1994 decision of the Merit Systems Protection Board (Board), No. DC0752930779–I–1, affirming the Administrative Judge's decision to sustain Goldstein's removal from his position of Officer, LE–01, with the United States Secret Service, Office of Protective Operations, Uniformed Division, Foreign Missions Branch. Because the Board's decision to sustain the Secret Service's charge of conduct unbecoming an officer was not supported by adequate findings based on substantial evidence, we *vacate* and *remand* for redetermination on the sustainability of the charge. Additionally, the Board's failure to consider and discuss significant mitigating circumstances in evaluating the reasonableness of the penalty constituted an abuse of discretion. We, therefore, *vacate* the Board's decision to sustain the penalty of removal, and *remand* for a redetermination

of the reasonableness of removal, if on remand the Board sustains the charge.

## DISCUSSION

### A. Background

The Uniformed Division of the Secret Service (agency) employed Goldstein as a sworn police officer for approximately four and one-half years. During those years, Goldstein made over 100 arrests without incident and received numerous commendations and positive comments from superiors with regard to his actions as a police officer, including improving the image of the Secret Service while serving as a community police officer in the Adams–Morgan area of the District of Columbia where the incident in question occurred. Nevertheless, the agency fired Goldstein for using two stun kicks to the head on a prone suspect who continually resisted being handcuffed, justifying this penalty because of Goldstein's "prior disciplinary record," which consisted of only minor citations concerning excused absences from duty and one incident of not immediately complying with the directions of his supervisor.

The incident began on a Saturday night, at 11:35 p.m., when Goldstein responded to a reported car theft in progress in a high crime area of Adams–Morgan. He was on regular patrol with Officer Jack Leskovar, an inexperienced junior officer, who initially remained in the police car while Goldstein went to assess the situation. He noticed that the steering column had been broken off and found Wilberto Escamilla in the car with a large screwdriver and car theft tools. Observed in the commission of the crime, Escamilla fled when Goldstein asked him for the vehicle's registration. Goldstein and Leskovar pursued him on foot until Officer Leskovar caught Escamilla several blocks later. In the ensuing struggle to gain control of Escamilla, Escamilla sustained a minor head injury when Leskovar succeeded in throwing Escamilla to the ground. Escamilla continued, however, to resist the officers' efforts to handcuff him, struggling against the officers' efforts to pull his arms out from under his torso and ignoring all of the officers' verbal commands to release his arms. Exhausted by the struggle and unable to

handcuff Escamilla, Leskovar then sat on Escamilla's back. Lying on his stomach, Escamilla continued to hold his arms below his torso. According to Leskovar's testimony, Escamilla was screaming angrily during the officers' struggle to gain control of his hands. Goldstein then administered two controlled kicks to Escamilla's head, Escamilla immediately released his arms, and Goldstein succeeded in handcuffing Escamilla. Escamilla was not injured or even bruised by the kicks. However, Goldstein did administer first aid for the injury Escamilla sustained when Leskovar tackled him to the ground. Escamilla did not file a complaint against either Goldstein or Leskovar.

The arrest drew a crowd of about thirty people from neighboring bars, many of whom became visibly agitated and unruly when they saw Goldstein kick Escamilla. Seven of the witnesses insisted on filing complaints, expressing extreme displeasure at what they perceived as Goldstein's excessive use of force in kicking a man who was already on the ground. Several wrote statements and later testified that Goldstein kicked Escamilla once after having placed handcuffs on him. One stated that Leskovar had only one of Escamilla's arms behind his back. Several also used the term "passive" to describe Escamilla because he was prone with Officer Leskovar sitting on his back, or because Escamilla was not kicking or waving his arms. Among these seven, three were practicing attorneys, one was the office manager for Senator Barbara Boxer, one was on the staff of a congressional committee, and one was the Chief of Staff for Congressman John Conyers. All but one of these witnesses admitted to drinking prior to witnessing Escamilla's arrest.

One witness testified that the incident reminded him of the Rodney King beating because "with the quest of events going on in the nation at the time, here [were] two officers of the law basically taking [police power] to the limit, . . . ." Although Escamilla was Hispanic, none of the witnesses alleged that Goldstein's use of force was racially motivated.

The agency removed Goldstein from his position for conduct unbecoming an officer based on the complaints from the six witnesses who claimed that Goldstein kicked Escamilla at least one time after Escamilla was "subdued."

The Administrative Judge (AJ) found that the statements of the seven witnesses constituted credible agency evidence that Goldstein kicked Escamilla sometime during the course of the arrest. Although the witnesses claimed that Goldstein kicked Escamilla *after* he was handcuffed, the AJ found, per Leskovar's testimony, that Goldstein had *not* kicked Escamilla after Goldstein had handcuffed him. The AJ credited Officer Leskovar's testimony as the most reliable evidence of what occurred that night because he was not intoxicated, was in the best position to observe Goldstein's actions, and was a trained officer. The AJ also found that Escamilla was under "control," despite not yet being handcuffed, because of Leskovar's testimony that Escamilla was immobilized, Leskovar was on top of him, and other units were responding.

The AJ sustained the charge of conduct unbecoming because she concluded that Goldstein's "conduct during the arrest was perceived as excessive police activity by the witnesses who observed it and [that the conduct] did reflect negatively on the image of the agency." The AJ also sustained Goldstein's removal as a reasonable penalty because the agency had relied on Goldstein's previous disciplinary citations and had previously utilized "progressive discipline" "without any rehabilitative effect."

In an opinion affirming the AJ's decision and modifying the opinion, the Board upheld the AJ's finding that Goldstein kicked Escamilla "after the latter was under Leskovar's control." The Board further concluded that, although the AJ failed to discuss the agency's Use-of-Force Policy and the testimony of training officers, the evidence showed that Goldstein did "exceed the agency's guidelines regarding the use of force," and that the AJ was ultimately correct in her findings and conclusions. The Board also sustained the penalty of removal because the misconduct "went to the heart" of Goldstein's duties as an officer, and because Goldstein's

record contained several disciplinary citations.

## B. Standard of Review

We affirm a decision of the Board unless it is found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule or regulation having been followed; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c) (1988); *Hathaway v. Merit Sys. Protection Bd.*, 981 F.2d 1237, 1240 (Fed.Cir. 1992). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Bd.*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Hathaway*, 981 F.2d at 1240 (citing *Consolidated Edison*).

## C. Conduct Unbecoming An Officer

Under 5 U.S.C. § 7513, an agency may only remove an employee "for such cause as will promote the efficiency of the service." *See Brook v. Corrado*, 999 F.2d 523, 526 (Fed.Cir.1993). This "nexus" limitation requires the agency to show by a preponderance of the evidence that the employee's misconduct is likely to have an adverse effect upon the agency's functioning. To this end, the agency must show: (1) that the employee committed the acts of misconduct charged, and (2) that there is a nexus between the employee's misconduct and the efficiency of the service. *See Cooper v. United States*, 639 F.2d 727, 226 Ct.Cl. 75 (1981). At issue in this case is whether Goldstein's actions constituted misconduct. According to the agency, Goldstein's use of excessive police power violated 31 C.F.R. § 0.735–57 by bringing disrepute upon the Secret Service and negatively impacting on the public confidence in the agency. Under 31 C.F.R. § 0.735–57 an employee shall not engage in criminal, infamous, dishonest, or notoriously disgraceful conduct, or any other conduct prejudicial to the government. However, the agency must show more than that a few bystanders were shaken by witnessing an arrest. Otherwise the mere fact that members of the public were shocked at a police officer's methods of performing his duties could result in removal of that officer, regardless of his compliance with police procedures designed to insure his and the public's safety. It would be particularly unreasonable to have such perceptions control where, as here, darkness, distance, and intoxication may have distorted those perceptions. We agree with the agency that here the nexus is clear, but only if the agency can show that Goldstein's conduct was improper. Specifically, the agency must show that under these circumstances Goldstein used excessive force in effecting the arrest.

We disagree that the findings in this case and the record on appeal are adequate to support a conclusion that Goldstein used excessive force in gaining control of Escamilla. First, both the AJ's and the Board's opinions ignore that the agency policy for determining how much force is acceptable in exercising police power speaks in terms of the force "necessary" to gain "lawful control." The agency Use-of-Force Policy (Policy) states:

[t]he objective of the use of force by officers is to establish and maintain *lawful control* in a timely manner so as to minimize the potential for injury to parties directly involved as well as others ... the degree of force authorized is that degree necessary to establish *lawful control* in a timely manner. (Emphasis added.)

Yet, neither the AJ nor the Board ever defines "control" in their opinions, much less the applicable standard, "lawful control." Both the AJ and the Board rely on Leskovar's statement that Escamilla was "under control" to conclude that the suspect was under control as contemplated by the Use-of-Force Policy phrase "lawful control." The AJ relies on Leskovar's statement that the suspect was under control, *prior to being handcuffed*, because the suspect was immobilized, Leskovar was on top of him, and other units were responding. The AJ elsewhere describes Escamilla as being "subdued." And the Board uses the terms "under control" and "subdued" interchangeably. The AJ and the Board appear to equate a suspect's being "subdued" with a suspect's being under "control," and never address the actual

standard of the written language in the Policy, "lawful control," or its relationship to a suspect resisting being handcuffed.

Whether an uncuffed suspect is ever under "lawful control," however, is very much in doubt. Leskovar himself testified that "the point of control" was that the officers could not handcuff the suspect, and that the officers were fighting for control of Escamilla, fighting for his hands. Officer Velasco, Goldstein's training officer, stated in uncontradicted testimony that an unhandcuffed suspect presents an *emergency* handcuffing situation, creating a priority on getting "control" of the suspect by handcuffing him: "[i]n emergency cuffing, . . . the main goal for the officer is number one, get the cuffs on the best and quickest way you can, gain control of the subject, and transport him out of there. . . . It's basically gain control, get the cuffs on, and gain control of the individual."

A policy mandating that such a suspect is not under "lawful control" is consistent with the officers' apparent training to assume the presence of a lethal weapon in every arrest situation until they determine otherwise. Here, Goldstein testified without contradiction that the officers are trained to assume that a suspect has a lethal weapon, and to gain "control" of the suspect by handcuffing him. Goldstein further testified that he did not know whether Escamilla still had the large screwdriver which could be used as a weapon to stab someone, and Leskovar testified that the officers did not know that Escamilla did not have a weapon. To read the agency's Use-of-Force Policy as characterizing an uncuffed suspect with a lethal weapon as under "lawful control" appears to this court as counter-intuitive, to say the least.

The Policy itself directs officers to use force "to establish and maintain *lawful* CONTROL." (Emphasis added, capitalized in original.) It defines such control as "the ability to command or direct," and states that force may be used to a) protect from harm, and/or b) to overcome resistance to lawful duties of the law enforcement representative. Thus, on remand, the Board must consider, *inter alia*, whether handcuffing was a "lawful" duty and whether Goldstein was acting to protect himself, Leskovar, and/or the crowd from harm given that Escamilla might have had a lethal weapon concealed in his waistband.

Further, much of the testimony in this case centered on whether Escamilla was an "active" or "passive" resistor because the Use-of-Force Policy prescribes different levels of force depending on the nature of resistance with which the officer is dealing. However, the Use-of-Force Policy does not expressly classify an unhandcuffed suspect as either "active" or "passive." Rather, the Policy states that its categories operate on multi-levels, so that the level of the suspect's cooperation, amount of muscular resistance, whether or not the suspect has a weapon, etc., all must be considered in determining whether an officer used an appropriate amount of force. Therefore, the Board must evaluate whether Goldstein's use of force was appropriate not just for a "passive" or "active" suspect, but under the full, multi-level analysis directed by the Policy. As we do not have a complete record before us, we do not determine what the appropriate level of force was under the circumstances.

Unless the Board can substantiate a finding otherwise based on the agency Use-of-Force Policy, in light of this testimony, we cannot agree that Escamilla was under "lawful control" because he was not handcuffed, he could have had a weapon tucked into his waistband, and he was forcibly resisting handcuffing after repeated verbal entreaties and despite the physical efforts by the officers to handcuff him. On the record on appeal, the Board's finding that Escamilla was under "control" or "subdued" before he was handcuffed is not supported by adequate predicate findings that are based on substantial evidence.

The appellate record also fails to support the Board's conclusion that Goldstein's use of a "stun kick" constituted inappropriate and excessive force under these circumstances. According to the Board, one of Goldstein's options under the Use-of-Force Policy was the use of stunning force. First, this finding presents a conflict in that it suggests that Escamilla was "actively" resisting because according to testimony from Sergeant Bertolotti, Velasco's supervisor, the officers are

not trained to use stunning on "passive" resistors. Yet, the Board elsewhere refers to Escamilla as "passive" and "subdued." The Board has to resolve the conflict and determine whether, under the agency Use-of-Force Policy, Escamilla's resistance merited use of "stunning force." In its evaluation, the Board should consider both whether Escamilla's resistance was so minimal as to not merit stunning force, as well as whether due to Escamilla's resistance and flagrant disregard of the officers' commands the officers could have been justified in using force *greater* than stunning force. Second, should the Board determine that "stunning" force was appropriate under the circumstances, it must then determine whether 1) any type of kick may be used to stun, 2) whether such a "stun" kick may ever be applied to a suspect's head, and 3) whether the kick Goldstein used was appropriate under the circumstances in this case.

The Board further rests its conclusion that Goldstein went beyond the force he was trained to use by using a kick to stun Escamilla on a misstatement and mischaracterization of the testimony in the record. The Board states that both of Goldstein's training officers testified that a "stunning blow to the head should be delivered by the heel of the hand," implying that the foot may never be used to administer a head stun. What Goldstein's training officer, Officer Velasco, actually stated in his testimony, however, was that he did not teach that kicks to the head were absolutely prohibited. In response to the general question "what is a head stun," he testified that it was "basically an open heel blow to the side of the head with the hand, usually right on the side of the head," at "one-hundred percent force," used to "gain control of the subject." Velasco then further testified that there was one type of kick that could be used for stunning. Similarly, Sergeant Bertolotti testified that a stun to the head was inappropriate in a "passive resisting situation," and that he never saw Officer Velasco teach that a foot kick to the head is appropriate. The government does not point to any evidence, however, that provides substantial support for the Board's apparent conclusion that the *only* type of stun appropriate to use on a suspect's head is a hand stun. Here Goldstein faced a situation where if he bent down to use his hand to stun Escamilla he would have exposed himself to injury, endangering himself, his partner, and possibly the gathering crowd.

Moreover, the rest of the record before us fails to generally support the Board's conclusion that the only appropriate stun in this situation was a hand stun. Although both the agency Deputy Assistant Director, Richard J. Griffin, and the agency Chief, David Lindsey, testified that kicks to the head are inappropriate, they both qualified their testimony. Griffin admitted that such kicks were only impermissible where "a passive suspect is not resisting," and Lindsey testified that "a stunning blow was used to apply cuffs." However, as we discuss above, neither the Board nor the AJ directly addresses whether a stun kick was appropriate under these circumstances, whether a stun kick is ever appropriate to subdue a suspect resisting arrest, or whether in the Use-of-Force Policy model ascribed to by the agency a suspect resisting being handcuffed is "active" or "passive" or something in between. Additionally, on remand, should the Board rely on Chief Lindsey's testimony, the Board must consider to what extent his testimony regarding the appropriateness of kicks to the head was based on his misperception that Goldstein kicked Escamilla *after* handcuffing him, and must reconcile Lindsey's testimony against head kicks per se with Velasco's testimony that one type of kick was appropriate for a head stun.

Because on this record we cannot identify adequate findings based on substantial evidence to support the Board's conclusion that Goldstein's actions constituted misconduct, we vacate the decision sustaining the charge. Escamilla resisted arrest by not allowing the officers to handcuff him, repeatedly ignoring the officers' verbal commands to allow them to handcuff him, and refusing to remove his hands from underneath his torso. On remand the Board must first determine the meaning of "lawful control" as it is used in the Use-of-Force Policy. It must also determine if Goldstein acted in accordance with the agency's Use-of-Force model. Then the Board must determine whether the force

used by Goldstein was "necessary" to establish "lawful control." If it was "necessary" to effect "lawful control," then according to the Policy's express wording it cannot be excessive. And if Goldstein did not exercise excessive force, then there was no misconduct on which the agency can base its charge of conduct unbecoming an officer. Bystanders' opinions are irrelevant in determining whether Goldstein violated the Use-of-Force Policy.

■ Per its own precedent in *Hillen v. Department of Army*, 35 M.S.P.R. 453 (1987), the Board must ensure that the AJ has made appropriate credibility judgments, detailing where and why she credited certain testimony over other testimony and resolving or reconciling all material conflicts in the record. Where the AJ has not, the Board must fill in the gaps, remanding for further evidentiary hearing if necessary. Although we review credibility and other factual determinations under an extremely deferential standard, where, as here, the Board and/or the AJ have failed to make necessary findings, we will not "rubber stamp" the decision because of a deferential standard of review.

*D. Reasonableness of the Penalty*

■ The Board's failure to consider and discuss mitigating circumstances in assessing the reasonableness of the removal penalty in this case constituted an abuse of discretion. *See VanFossen v. Department of Housing and Urban Dev.*, 748 F.2d 1579, 1580 (Fed. Cir.1984) (failure to consider a significant mitigating circumstance constitutes an abuse of discretion). The Board failed to consider Goldstein's numerous commendations for good service, his 100 plus arrests without incident, and the fact that all of the periodic reviews of his performance were satisfactory. The Board also failed to consider the lack of any complaint from Escamilla himself and the absence of any injury resulting from Goldstein's actions. Additionally, the Board failed to consider the unusual tension in this situation where Goldstein's partner had "given up" the struggle to handcuff the suspect because he was too tired, that Goldstein was responsible for safeguarding Leskovar and the crowd should Escamilla have had a weap-

on, and that Goldstein essentially had a one-on-one situation where he could not take any chances of not gaining full control (or losing control) of the suspect. *See Douglas v. Veterans Admin.*, 5 MSPB 313, 5 M.S.P.R. 280, 331–32 (1981) (list of potential factors for consideration in determining reasonableness of penalty).

■ The Board's analysis of Goldstein's potential for rehabilitation was also incorrect and inadequate. Goldstein had no prior disciplinary record for exercising excessive force—or any other misconduct toward civilians. Thus, it was error for the Board to conclude that prior citations or reprimands for minor and unrelated citations, mostly connected to Goldstein's problem with migraine headaches, had any material bearing on his potential for rehabilitation so as not to use excessive force in effecting arrests. If on remand the Board finds that Goldstein violated the agency Use-of-Force Policy, it will be his first disciplinary action for this conduct. Given the ambiguity as to the appropriate level of force in this situation, the Board should consider Goldstein's transgression less serious, especially considering that Goldstein's training officer, Officer Velasco, testified that one type of kick was used for stunning and that a suspect was not deemed under control until handcuffed, indicating Goldstein's behavior was consistent with his training.

Even if the agency had sustained its charge, on these findings and on the record on appeal, removal is an unreasonable penalty, and the Board abused its discretion in sustaining it. On remand, if the Board finds that Goldstein used excessive force, it must consider all relevant mitigating factors—including the unusual circumstances of the situation, the considerable potential for rehabilitation in this case, and Goldstein's otherwise generally good service record—in assessing the reasonableness of the penalty.

CONCLUSION

Because the Board must redetermine whether, in light of the agency's Use-of-Force Policy, Goldstein exercised unnecessary and therefore excessive force under the

circumstances of this case, we vacate the Board's finding that the agency established the charge of conduct unbecoming an officer of the Secret Service Uniformed Division. We remand for redetermination of whether Goldstein's actions constituted misconduct, and direct the Board to make all necessary findings and to adequately resolve conflicts in the record.

We also vacate the Board's determination that the penalty of removal was reasonable where the Board and AJ failed to consider, *inter alia*, that this was Goldstein's first citation for use of excessive force, there was conflicting testimony as to proscribed procedures from the training officers and the Deputy Chief, that Goldstein otherwise had commendations with only minor infractions of leave policy and cooperation with his supervisor in his service record, and that the circumstances of the arrest are also mitigating factors. Therefore, we remand for a redetermination of the reasonableness of the penalty.

### COSTS

The government to bear costs.